Filed 1/8/25  P. v. Jones CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DEDRICK DACKNELL JONES,<br><br>    Defendant and Appellant. | D082412<br><br><br>(Super. Ct. No. SCD292844) |

APPEAL from a judgment of the Superior Court of San Diego County, Francis M. Devaney, Daniel F. Link, Aaron H. Katz, and Dwayne K. Moring, Judge.  Affirmed.

Aurora E. Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Christine Y. Friedman and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

Dedrick D. Jones appeals from (1) his conviction for exhibiting a deadly weapon to resist arrest (Pen. Code,[1] § 417.8, count 3); (2) the trial court's true finding regarding two aggravating circumstances that in part led to the court's imposition of the midterm sentence; and (3) the pretrial order denying his request for mental health diversion. In support, Jones argues we must reverse his conviction on count 3 because the trial court violated his rights under the Sixth and Fourteenth Amendments when he was unable to make an oral declaration to the court, which he claims would have triggered its obligation to conduct a *Marsden*[2] inquiry, after he expressed general dissatisfaction with appointed counsel. He also argues the court erred as a matter of law in making the true findings on the two aggravating circumstances; and that we must conditionally remand the judgment because of retroactive amendments to the mental health diversion law.

As we explain, we conclude the trial court had no duty to conduct a *Marsden* inquiry because Jones unequivocally requested to represent himself, and at no time did he express an intent, much less a "clear intent," to have new counsel appointed. We also conclude that, after having his pro se status revoked, Jones forfeited this claim of error when he failed to object to the reappointment of the Office of the Public Defender.

In addition, we conclude the trial court did not err in sentencing Jones to the middle term on count 3, based on its true findings on multiple aggravating circumstances and Jones's lengthy criminal record. Ample evidence supported the trial court's decision because Jones's record reflected his crimes were increasing in violence.

---

[1]     All further statutory references are to the Penal Code.

[2]     *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

Finally, it is unnecessary to conditionally reverse the judgment because the amendments to the mental health diversion law are irrelevant to the trial court's finding that Jones posed an unreasonable risk of danger to public safety if treated in the community. We thus affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

During an incident on December 17, 2021, Jones, armed with a knife, used "threats and violence" to "willfully and unlawfully" deter and prevent— and "knowingly resisted by the use of force and violence"—police officers from performing their lawful duties. During the same incident, Jones "willfully, maliciously, unlawfully and with no legal justification" used a knife to inflict serious bodily injuries on "Hondo," a police dog, while an officer supervised the dog in the discharge of its duties.[3]

At about noon on the day of the incident, San Diego police officers responded to a call in the Midway District, after the reporting party claimed Jones vandalized her car and threatened her.[4] The first officer to arrive contacted the reporting party; as the officer and the reporting party spoke, Jones approached and began talking to the officer. For safety reasons, the officer wanted to conduct a pat-down search of Jones, since Jones wore "baggy clothing" and appeared to have an object in his pocket. Jones denied having any weapons and began walking away from the officer. The officer instructed Jones to put his hands behind his back for the search. Jones responded he did not want to be touched.

---

[3] This portion of the summary is taken from the factual basis for Jones's plea to counts 1, 2, and 4, discussed *post*. The remaining facts are derived from Jones's trial.

[4] The claim that Jones vandalized the car would turn out to be mistaken.

While waiting for backup, an off-duty San Diego police officer contacted the responding officer and described a previous contact with Jones and stated that Jones was "known to be armed." The responding officer relayed this information to the police department dispatch. Soon after, two more officers arrived and walked towards the scene. The responding officer then saw Jones pick up a plastic bag containing an eight-inch metal object or "tool." Jones pulled out a "folding knife" and opened the three- or four-inch blade into a "fixed position." More officers arrived, including a K-9 officer with a dog named Hondo.

Jones refused the officers' repeated commands to drop the weapons and instead walked into oncoming traffic. Concerned Jones might attempt to carjack a vehicle, and considering Jones's apparent disregard for his own safety, the safety of the officers, and the public, the officers drew their firearms. Jones continued to act erratically, by climbing on top of a car and jumping up and down. After dismounting the vehicle while still holding the knife and plastic bag; an officer fired two non-lethal beanbag rounds at Jones without result.

Given Jones's refusal to drop his weapon, even after several warnings, repeated requests, and the inefficacy of other non-lethal tactics, the situation was now "too dangerous" and "too risky," so Hondo's handler released the dog. Hondo knocked Jones to the ground and bit him. As the dog maintained its bite, Jones stabbed Hondo with the knife. Hondo suffered two wounds, including one that was three inches long and required stitches.

Jones did not cooperate or surrender during the entire 16- to 18-minute encounter. It took multiple officers' (and Hondo's) efforts to disarm and arrest Jones.

4

On November 8, 2022, trial commenced on four counts:  harming or interfering with a police animal causing serious injury to it (count 1, a violation of § 600, subd. (a)); animal cruelty (count 2, a violation of § 597, subd. (a)); exhibiting a deadly weapon to a police officer to resist arrest (count 3, a violation of § 417.8); and, resisting an executive officer (count 4, a violation of § 69).  The People also alleged a 2021 strike prior and serious felony prior based on the same conviction—also involving injury to a police animal.

DISCUSSION

I.

A *Marsden* Hearing Was Unnecessary Because Jones Unequivocally Invoked His Right to Self-represent and Waived His Right to Counsel

Jones contends the trial court violated his constitutional rights when it refused to hear a prepared oral declaration, which he claims would have triggered the court's obligation to conduct a *Marsden* inquiry.  We are not persuaded.

A.  *Additional Background*

At a June 23, 2022 hearing, when the trial court called the matter Jones spoke up and said, "Good morning, your Honor.  I want to make it clear that I have informed [defense counsel] Mr. [Denis] Lainez that he does not have my consent to represent me at all this morning and I also have prepared an oral declaration."  Mr. Lainez informed the court he had been representing Jones since December 2021 and that, based on their conversations, he had concerns about Jones's competency.  The court suspended criminal proceedings and ordered Jones to undergo a mental competency examination.

5

David Naimark, M.D. conducted Jones's mental competency exam. Dr. Naimark personally interviewed Jones and reviewed Jones's jail psychiatric records. Dr. Naimark diagnosed Jones with an amphetamine-induced psychosis, in remission; and declared Jones competent to stand trial, opining Jones was able to understand the criminal proceedings and cooperate in his defense.

At the start of the competency hearing, as Mr. Lainez announced his appearance Jones interrupted and told the trial court, "Just so you know, your Honor. I told Mr. Lainez at the last appearance in court, he does not have permission to represent me." The parties stipulated to the admission of Dr. Naimark's report, and the court reinstated criminal proceedings. Mr. Lainez asked the court for a continuance to allow Jones to submit his "*Lopez* paperwork."[5] The court granted that request, stating, "I understand Mr. Jones wishes to represent himself now that he has been found competent."

At the next hearing, Mr. Lainez confirmed that Jones wanted to represent himself. The trial court indicated it had received a "*Faretta/Lopez* waiver" by Jones; informed Jones of his constitutional rights, including the right to appointed counsel, and that Mr. Lainez was a "very skilled and very competent" attorney who had tried multiple, "very serious cases." The trial court further advised Jones it was "not a wise choice" to represent himself. Jones admitted he was facing a lengthy sentence if convicted on all counts,

---

[5] *People v. Lopez* (1977) 71 Cal.App.3d 568, 572–573, set guidelines for warnings that a trial court should use to caution a defendant when the defendant requests a waiver of appointed counsel in favor of self-representation pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

6

and recognized he would not receive any "special privileges just because [he was] [self-]representing."

The trial court then asked Jones why he wanted to represent himself. Jones replied: "Because I know exactly what happened" and would do a "good job representing myself." The court informed Jones Mr. Lainez had been "very passionate" about Jones's circumstances during multiple chambers conferences. Jones responded: "To be honest, I really would like to just do my best job of defending myself on my own behalf because there's a discrepancy as to the knowledge base of the *true facts*." (Italics added.)

The trial court asked Jones if he wanted a recess to meet with Mr. Lainez to discuss this "very important decision." Shortly thereafter, Jones replied, "I truly feel like I'm not even doing that, but I have actually *thoroughly* thought it out." (Italics added.) Jones then complained about Mr. Lainez, leading to the following colloquy:

> The Court: Okay. I'm sorry. I apologize for interrupting you because I do want to hear everything and I am hearing everything you're saying.
>
> But are you saying that you want to fire Mr. Lainez—
>
> The Defendant: Yes.
>
> The Court: —or are you saying you want to represent yourself, because those are two different things?
>
> The Defendant: Both are in my package of desires. I do— he doesn't work for me. I want him off my case, *and I do want to represent myself*.
>
> The Court: Okay. What else would you like to tell me, if anything—
>
> The Defendant: Well—

7

The Court: —with regards to representing yourself?

The Defendant: Yes. I've prepared an oral declaration because of the discrepancies due to the lack of diligence. Certain things have been happening that I have reflected upon. And based on evidence, you know—

The Court: Who is going to present them?

[¶] . . . [¶]

The Defendant: I have it. It's going to be oral, but I have it written so I can present it to the court early. . . ." (Italics added.)

The trial court reiterated Mr. Lainez was a "competent and skilled" trial attorney and was "very passionate" about protecting Jones's rights. The court then asked, "and you still want to represent yourself?" to which Jones responded, "Yes." The court granted Jones's request to self-represent, noting Jones was "clearly intelligent enough" and it was his constitutional right to do so. Jones waived his right to a speedy trial and agreed to start trial in early November 2022.

Jones represented himself at trial. The jury convicted him on count 3, exhibiting a deadly weapon to a police officer to resist detention or arrest. (§ 417.8.) The jury deadlocked on count 1, harm or interference with a police animal, serious injury to animal (§ 600, subd. (a)); count 2, animal cruelty (§597, subd. (a)); and count 4, resisting an executive officer (§ 69). The trial court declared a mistrial on those counts.

B. *Guiding Principles*

The duty to conduct a *Marsden* inquiry arises only when a defendant asserts counsel's performance denied the defendant the constitutional right to effective counsel. (*People v. Leonard* (2000) 78 Cal.App.4th 776, 787

8

(*Leonard*).) A defendant's *Faretta* motion for self-representation differs from a *Marsden* motion for substitution of counsel, "one raising the question of defendant's competency to waive his right to counsel, and the other raising the question of existing counsel's competency." (*People v. Burton* (1989) 48 Cal.3d 843, 855 (*Burton*).) A criminal defendant has a constitutional right to choose self-representation instead of representation by counsel. (*Faretta, supra*, 422 U.S. at pp. 807, 819–821.) However, a request for self-representation does not trigger a duty to conduct a *Marsden* inquiry or suggest substitution of counsel as an alternative. (*People v. Clark* (1992) 3 Cal.4th 41, 105.)

When a defendant seeks to discharge his or her appointed counsel and substitute another attorney, a trial court must permit the defendant to explain the basis of his or her dissatisfaction with counsel and relate specific examples of counsel's alleged inadequate performance. (*Marsden, supra*, 2 Cal.3d at p. 124.) But this duty of inquiry only arises if the defendant has provided " 'some clear indication' " that he or she wishes to substitute counsel. (*People v. Sanchez* (2011) 53 Cal.4th 80, 89–90 (*Sanchez*), quoting *People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. 8; accord, *People v. Martinez* (2009) 47 Cal.4th 399, 418 ["trial court's duty to conduct an inquiry into the reasons the defendant believes his or her attorney is incompetent arises only when the defendant (or in some instances counsel) provides ' "at least some clear indication" ' that the defendant wishes to substitute counsel"].)

"A trial court must grant a defendant's request for self-representation if three conditions are met. First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation. [Citations.] Second, he must make his request *unequivocally*. [Citations.] Third, he must make his

9

request within a reasonable time before trial. [Citations.]" (*People v. Welch* (1999) 20 Cal.4th 701, 729, italics added; accord, *People v. Thomas* (2023) 14 Cal.5th 327, 397.)

The requirement that a *Faretta* motion be unequivocal helps to ensure that the defendant "truly desires" to self-represent. (*People v. Marshall* (1997) 15 Cal.4th 1, 23 (*Marshall*).) A defendant's request for self-representation is equivocal " 'if the defendant's statements or actions create *any ambiguity as to his desire* to represent himself.' " (*Ibid.*) "[V]acillation between requests for counsel and for self-representation amounts to equivocation or to waiver or forfeiture of the right of self-representation." (*Id.* at p. 22; accord *People v. Barnett* (1998) 17 Cal.4th 1044, 1109–1110 [rejecting the defendant's claim the trial court erred in denying his *Faretta* motion because the "record does not reflect an unequivocal assertion of the right of self-representation"].) "In determining on appeal whether the defendant invoked the right to self-representation, we examine the entire record de novo." (*People v. Dent* (2003) 30 Cal.4th 213, 218 (*Dent*).)

C. *Analysis*

Our high court's decision in *Burton* guides the analysis on this issue. The *Burton* court concluded the trial court had no duty to make a *Marsden* inquiry when the defendant had made a *Faretta* motion based on dissatisfaction with appointed counsel. (*Burton, supra*, 48 Cal.3d at p. 855.) In so doing, the court reasoned:

> Although defendant expressed dissatisfaction with his attorney, he made repeated, explicit requests to represent himself and gave reasons why he thought he would be more persuasive and effective than counsel. He never suggested he would like a different attorney. [Citation.] Nor is it the rule that whenever a defendant makes a motion to represent himself on the basis of dissatisfaction with

10

counsel, the court automatically should inquire whether he would like to make a motion for substitution of counsel. (*Burton, supra*, 48 Cal.3d at p. 855; accord, *People v. Lara* (2001) 86 Cal.App.4th 139, 150 [trial court does not have a sua sponte duty to initiate a *Marsden* inquiry]; *Leonard, supra*, 78 Cal.App.4th at p. 787.)

Like the defendant in *Burton*, Jones made several, "explicit requests to represent himself." (*Burton, supra*, 48 Cal.3d at p. 855.) Also like the defendant in *Burton*, Jones explained why he wanted to self-represent (see *ibid*.), as he alone knew the "true facts" and "exactly what happened." Jones also told the court he had "thoroughly thought this out," and felt he could do a better job than Mr. Lainez if he represented himself.

Also like the defendant in *Burton*, Jones never suggested he wanted new counsel appointed. That Jones stated his dissatisfaction with Mr. Lainez, and stated he wanted to make an oral declaration, does not amount to a " 'clear indication' " he wanted substitute counsel. (*Sanchez, supra*, 53 Cal.4th at pp. 89–90 [although no formal or specific language is necessary to ask for a *Marsden* hearing, the trial court is not obligated to conduct such a hearing unless there is " 'at least some *clear indication* by defendant' " that he or she wants substitute counsel (italics added)].)

Indeed, appointing new counsel would not have addressed Jones's stated reason for wanting to self-represent; new counsel would also not know the "true facts" and "exactly what happened" during the December 17 incident. We thus independently conclude Jones " 'articulately and unmistakenly demanded to proceed *pro se*,' " and the trial court did not err in granting that request without making a *Marsden* inquiry. (*Marshall, supra*, 15 Cal.4th at p. 21; *Dent, supra*, 30 Cal.4th at p. 218 [de novo review applies to the question of whether a defendant invoked right to self-represent].)

11

Jones nonetheless argues his request to self-represent was an "expression of frustration, not a true request" because the trial court failed to listen to his oral declaration. In support, Jones cites to *Reese v. Nix* (8th Cir. 1991) 942 F.2d 1276 (*Reese*).[6] The defendant in *Reese* repeatedly asked for the appointment of new counsel, and even suggested the name of counsel he wanted appointed. (*Id.* at p. 1278.) The court refused the defendant's request, noting defense counsel already successfully appealed the defendant's first degree murder conviction and knew the case well, was the most experienced and competent attorney in the area in handling capital cases, and left no "stone unturned" in representing the defendant. (*Ibid.*) Defendant then twice responded, "Well, I don't want no counsel then." (*Id.* at p. 1279.) The court refused to allow the defendant to self-represent.

The defendant in *Reese* was convicted of first degree murder, exhausted his state court remedies, and sought relief in the federal courts. (*Reese, supra*, 942 F.2d at pp. 1279–1280.) The district court granted the defendant's petition for a writ of habeas corpus on the ground that the trial court had improperly ignored Reese's request to represent himself. But the Eighth Circuit reversed the district court and concluded the defendant's statement of, "Well, I don't want no counsel then," was an "impulsive," "isolated" response to the denial of his request for new counsel, and not a clear and unequivocal invocation of his right to proceed pro se. (*Id.* at p. 1281.) *Reese* actually supports our decision in this case, as the defendant there made a " 'clear indication' " that he wanted new counsel, unlike Jones in the instant

---

6    We note that decisions from lower federal courts are persuasive, but not binding, authority on state courts. (*People v. Zapien* (1993) 4 Cal.4th 929, 989.)

case.  (*Reese, supra,* 942 F.2d at p. 1281; *Sanchez, supra,* 53 Cal.4th at pp. 89–90.)

In sum, we conclude the trial court was under no obligation to initiate a *Marsden* inquiry.  (See *Burton, supra,* 48 Cal.3d at p. 855 [defendant's request to self-represent does not "automatically" require a court to inquire whether the defendant wants substitute counsel]; *Leonard, supra,* 78 Cal.App.4th at p. 787.)  We therefore reject this claim of error.

II.

### The Reappointment of Mr. Lainez Did Not Violate Jones's Constitutional Right to Assistance of Counsel

Jones contends the reappointment of Mr. Lainez, after the trial court revoked Jones's pro se status, separately violated his constitutional right to the assistance of competent and conflict-free counsel.  We disagree.

A.  *Additional Background*

Following the jury trial that led to his conviction on count 3, the People arraigned Jones on counts 1, 2, and 4.  During the March 21, 2023 pretrial hearing, the trial court noted it was having "trouble tracking" some of Jones's requests and arguments.  The court took a recess to allow Jones to "collect [his] thoughts."  Upon resumption of the hearing, the court continued to tell Jones it was having difficulty understanding him, including when Jones inquired whether the court had received his " 'statement of defense.' "  Jones asked the court for "guidance in this case," and before the court could respond, Jones stated:  "I'm not asking you.  What—I'm telling you that I would ask you to stop f---ing around with me."  Jones then went on an extended, vulgar rant directed at the trial judge.  The court adjourned the hearing, adding it was concerned about Jones's mental health.

13

The following morning, on what was supposed to be the start of trial, the court addressed Jones's behavior from the previous day. The court noted Jones had "trouble tracking what was taking place in the courtroom," his behavior had been "vulgar" and unacceptable, and he had been "talking to [himself]." The court also noted that the trial had been delayed that morning because Jones had been uncooperative and "combative" with the bailiffs, placing Jones's safety and the safety of the bailiffs at risk; and that Jones's behavior was "inconsistent" with what the court had witnessed during the first trial, when he was "extremely professional."

Jones told the trial court he felt "fine," that his problem was "merely the second trial" and "stress," and that he had suffered a mental health breakdown the day before due to being "sleep deprived." The court cautioned Jones against engaging in any further disruptive behavior, particularly in front of the jury, and ordered him unshackled.

Just moments before jurors were set to enter the courtroom to begin voir dire, Jones informed the trial court he was not prepared for trial. Jones claimed his papers had dropped on the floor during a "tussl[e]" with the bailiffs and documents were now out of order and some pages were missing. The court offered to have the jurors come back at 1:30 p.m. to give Jones time to organize his paperwork. Jones declined, stating he should "never [have] trusted [the court] or [its] fake-ass government." Jones then went on another vulgar and profane rant directed at the trial judge, leading the court to restrain him. As Jones's tirade continued and even intensified, the court stated it had a "doubt as to his competency." The court revoked Jones's pro se status and reappointed counsel. It also suspended criminal proceedings and ordered him to undergo another mental competency exam.

Nicholas Badre, M.D. performed Jones's competency evaluation. Jones denied having ongoing symptoms of mental illness and "reported 'good' concentration, mood, sleep, and energy." Dr. Badre found Jones was able to describe his defense, knew the charges against him, his possible sentence if convicted, and understood he was expected to act respectfully in court. Jones told Dr. Badre he felt "ready and able to assist counsel."

Dr. Badre opined with "reasonable medical certainty" that Jones had a "rational and factual understanding" of the pending charges, was "able to assist counsel in a rational manner," and "did not display symptoms of mental illness that would prevent the understanding of the case or the ability to participate with his counsel."

At the next hearing, Mr. Lainez specially appeared for Jones. Mr. Lainez explained that, after the trial court had revoked Jones's pro se status, the public defender's office reopened the case and reappointed Mr. Lainez to represent Jones. Mr. Lainez represented that he had recently visited with Jones, they discussed the new competency report prepared by Dr. Badre, and Jones "want[ed Mr. Lainez] to represent him again." The court confirmed Mr. Lainez's appointment and reinstated criminal proceedings against Jones.

B. *Analysis*

Jones does not challenge on appeal the termination of his pro se status. (See *Faretta, supra,* 422 U.S. at pp. 834, fn. 46 [trial court "may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct"]; accord, *People v. Fitzpatrick* (1998) 66 Cal.App.4th 86, 92 [right of self-representation is not absolute and is not a license to abuse the dignity of the courtroom]; see also *People v. Carson* (2005) 35 Cal.4th 1, 12 [great deference is afforded to the trial court's "assessment of the defendant's motives and sincerity as well as the nature

and context of his misconduct and its impact on the integrity of the trial"].) However, Jones on appeal faults the trial court's decision to reappoint Mr. Lainez as defense counsel, claiming this violated his constitutional right to have competent and conflict-free counsel. We disagree.

First, we clarify, that the trial court reappointed the Office of the Public Defender, not specifically Mr. Lainez. As Mr. Lainez explained, "When [the Office of the Public Defender] became aware of the [May 2023 competency] evaluation, the case was reopened, [and] reassigned to me, since I have been Mr. Jones' attorney for a significant amount of time."

Second, there is no evidence in the record that Mr. Lainez was incompetent or had a conflict in representing Jones. We do not automatically assume that such evidence existed in the oral declaration Jones requested to read to the trial court *before* it approved his unequivocal request to self-represent. To do so would "require us to engage in pure speculation, and violate a basic tenet of appellate review." (See *People v. Alvarez* (1996) 49 Cal.App.4th 679, 695.)

Third, the Sixth Amendment " ' "guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he [or she] is without funds." ' " (*People v. Noriega* (2010) 48 Cal.4th 517, 522, quoting *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144.) However, that " 'right to counsel of *choice* does not extend to defendants who require counsel to be *appointed* for them.' " (*Noriega*, at p. 522, quoting *Gonzalez-Lopez*, at p. 151.) Similarly, "[o]ur 'state Constitution does not give an indigent defendant the right to *select* a court-appointed attorney.' " (*Noriega*, at p. 523, quoting *People v. Jones* (2004) 33 Cal.4th 234, 244.)

Consequently, we reject Jones's contention the trial court abused its discretion when it reappointed Mr. Lainez as defense counsel. Mr. Lainez was familiar with Jones's case, since Mr. Lainez represented Jones between December 2021 and June 2022; and as Mr. Lainez informed the court, "Mr. Jones agrees that he's competent and wants me to represent him again." (See *People v. Cole* (2004) 33 Cal.4th 1158, 1184–1185 ["On appeal, a trial court's orders concerning the appointment of counsel for an indigent defendant are reviewed for abuse of discretion."].)

Finally, when Jones appeared with Mr. Lainez following Mr. Lainez's reappointment, Jones then did not object or otherwise request substitute counsel. " ' " 'The purpose of the general doctrine of waiver [or forfeiture] is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . .' " [Citation.] " 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal . . . cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " ' " (*People v. Simon* (2001) 25 Cal.4th 1082, 1103 [defendant forfeited his right to object to the venue where he was tried by failing to timely assert such objection in the trial court].)

At the time of reappointment, Jones had just passed a second, court-ordered mental competency exam. Dr. Badre opined with "reasonable medical certainty" that Jones was "able to assist counsel in a rational manner" and "did not display symptoms of mental illness that would prevent the understanding of the case or the ability to participate with his counsel." Considering Jones's competency and his failure to object to Mr. Lainez's reappointment, we separately conclude he forfeited this claim of error on appeal.

17

## The Trial Court Properly Exercised Its Sentencing Discretion by Imposing the Middle Term on Count 3

Jones contends the trial court abused its discretion under section 1170, subdivision (b)(6) in sentencing him to the middle term of three years on count 3. We reject this claim of error.

A. *Additional Background*

On November 22, 2022, following the jury's November 18 guilty verdict on count 3, the trial court held a bench trial on the prior conviction allegations and aggravating circumstances. The information alleged Jones had a serious felony prior and a strike prior stemming from his convictions on April 13, 2021, for animal cruelty by use of a deadly weapon (i.e., a knife) in the commission of a felony (§§ 597, subd. (a); 12022, subd. (b)(1)); and resisting an executive officer by means of a threat or violence (§ 69). (*People v. Jones* (Super. Ct. San Diego County, 2021, No. SCD288865) (case No. 8865).) The information also alleged four aggravating circumstances: Jones was armed with or used a weapon during the commission of the current offenses (Cal. Rules of Court,[7] rule 4.421(a)(2)); the court imposed concurrent instead of consecutive sentences in case No. 8865 (rule 4.421(a)(7)); Jones's prior convictions were numerous and increasing in seriousness (*id.*, (b)(2)); and he committed the current offenses while on probation (*id.*, (b)(4)). The trial court found the People proved "beyond a reasonable doubt" that Jones sustained a serious felony prior and a strike prior and the four aggravating circumstances. On December 20, 2022, at a status and sentencing hearing,

---

[7] All further undesignated rule references are to the California Rules of Court.

the trial court arraigned Jones on an amended information re-alleging the three counts on which the original jury could not make decisions.[8] Jones pleaded not guilty.

On March 21, 2023, Jones returned to court for retrial. As described *ante*, Jones's behavior in the courtroom became belligerent. The next day, the court suspended criminal proceedings, referred Jones for a competency evaluation, and reappointed the Office of the Public Defender (which in turn reassigned Mr. Lainez) to the case. After returning to court on May 4, 2023, Jones was found competent to stand trial with a settlement conference scheduled for May 10, 2023.

At the May 10 plea hearing Jones admitted guilt to the remaining three charges with no agreement from the People. However, the trial court noted Jones pled "to the sheet," and the court would consider a minimum sentence of five years eight months, and a maximum sentence of 12 years four months. Jones stated he understood the terms of the agreement and admitted to the serious felony prior.

The probation report recommended the trial court sentence Jones to 17 years eight months on both cases: 15 years, four months in the instant case, and two years four months for the probation violation. The probation report reviewed the possible circumstances in mitigation in rule 4.423, and found none applicable. The report found multiple possible circumstances in aggravation; and recommended consecutive sentencing, given the two cases involved separate acts of violence only 11 months apart.

---

[8]    The amended information renumbered the original count 4 as count 3. However, on May 10 the trial court changed the numbering back to accommodate Mr. Jones's change of plea to the remaining charges.

Prior to sentencing, the defense filed a *Romero*[9] motion and a statement in mitigation asking the court to impose five years in state prison. Attached to these filings were 17 attachments, including transcripts of interviews with Jones's sister, brother, aunt, cousin, and various witnesses to the incident, as well as school and hospital records, among many other documents. In addition to asking the trial court to dismiss Jones's prior strike conviction, the defense also argued pursuant to section 1170, subdivision (b)(6) that it should impose the low term on count 3, because Jones was "born addicted to drugs, [and] . . . suffered significant trauma before he was a teenager that included emotional, physical and sexual abuse."

The People filed a sentencing brief arguing the trial court should sentence Jones to the maximum of 12 years four months under the court's indicated range which included all of Jones's cases. Circumstances in aggravation included: (1) the crime charged in count 3 involved great violence, great bodily harm, or acts with a high degree of cruelty, viciousness, or callousness (rule 4.421(a)(1)); (2) Jones was armed with or used a weapon in the commission of the crime (*id.*, (a)(2)); (3) he continues to engage in violent conduct that indicates a serious danger to society (*id.*, (b)(1)); (4) his prior convictions are numerous and of increasing seriousness (*id.*, (b)(2)); (5) he was on probation when he committed the instant offenses (*id.*, (b)(4)); and (6) his prior performance on probation has been unsatisfactory (*id.*, (b)(5)).

At sentencing, the trial court refused to strike Jones's strike prior pursuant to *Romero,* set count 3 as the principal term, and chose the midterm

---

9    *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

sentence of three years, doubled by the strike, after finding the aggravating circumstances outweighed the mitigating factors. On count 1, the court imposed a consecutive sentence of 16 months, and an additional four months for the weapon enhancement, to run consecutively. On counts 2 and 4, the court imposed the middle term of two years, doubled by the strike, and stayed punishment on both counts and on the one-year enhancement attached to count 4. (§ 654, subd. (a).) The court struck the five-year serious felony enhancement (§ 1385, subd. (c)(2)) and found that imposition of the middle term and the "Three Strikes" law were "sufficient punishment" for Jones. For the probation violation from case No. 8865, the court sentenced Jones to 16 months. In total, the trial court imposed a prison term of nine years.

B. *Guiding Principles*

"Effective January 1, 2022, our determinate sentencing law, section 1170, was amended in several fundamental ways. (See Sen. Bill No. 567 (2020–2021 Reg. Sess.); Stats. 2021, ch. 731, § 1.3; Assem. Bill No. 124 (2020–2021 Reg. Sess.); Stats. 2021, ch. 695, § 5.)" (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038.) Senate Bill No. 567 amended section 1170, subdivision (b) to authorize determinate sentences above the middle term "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).)

Assembly Bill No. 124 made additional changes to section 1170. As relevant here, section 1170, subdivision (b)(6) now provides: "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the

21

interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." (§ 1170, subd. (b)(6), (A).)

Amendments to the California Rules of Court were also made to reflect the new legislation. As pertinent here, rule 4.420(d) provides:

> In selecting between the middle and lower terms of imprisonment, the sentencing judge may consider circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision. The court may consider factors in aggravation and mitigation, whether *or not* the factors have been stipulated to by the defendant *or found true beyond a reasonable doubt at trial by a jury or the judge in a court trial.* The relevant circumstances may be obtained from the case record, the probation officer's report, other reports and statements properly received, statements in aggravation or mitigation, and any evidence introduced at the sentencing hearing. (Rule 4.420(d), italics added.)

Consistent with rule 4.420(d), our court recently concluded that the imposition of the middle term did not require aggravating circumstances to be proven beyond a reasonable doubt. (*People v. Hilburn* (2023) 93 Cal.App.5th 189, 203 (*Hilburn*); accord, *People v. Bautista-Castanon* (2023) 89 Cal.App.5th 922, 929 [declining "to import [the subdivision (b)(2)] requirement into section 1170, subdivision (b)(6) as a prerequisite to imposing the middle term"].) We noted in *Hilburn* that if the Legislature wanted to impose such a requirement, it knew how based on the language of section 1170, subdivision (b)(2). (*Hilburn*, at p. 204.) We concluded that section 1170's subdivision (b)(6) did "not run afoul of the constitution's jury trial guarantee because the provision 'creates a potential *reduced* term, as

22

opposed to an *increased* term, for certain enumerated defendants based on judicial findings of eligibility and whether imposition of a low term sentence is in the interest of justice' " (*ibid.*); and that a "sufficient factual basis" is all that is required to support circumstances in aggravation or mitigation (*id.* at p. 205). Once this showing is made, we concluded the trial court "enjoys broad discretion in its sentencing determination." (*Id.* at p. 206.)

C. *Analysis*

Jones contends the trial court erred as a matter of law in finding two aggravating factors true: rule 4.421(a)(2)—"armed with or used a weapon" in the commission of the crime; and rule 4.421(a)(7)—"convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed." In making this argument, Jones recognizes the court made true findings on two other factors *not* challenged on appeal: rule 4.421(b)(2)—his prior convictions "are numerous or of increasing seriousness"; and rule 4.421(b)(4)—he committed the crime while on probation. Jones also recognizes that a single aggravating factor may support a sentencing choice. (See *People v. Yim* (2007) 152 Cal.App.4th 366, 369.)

The People's sentencing memorandum included *additional* aggravating circumstances, none of which Jones challenges on appeal. They included: rule 4.421(a)(1)—his crime involved great violence, bodily harm, or acts with a high degree of cruelty, viciousness, or callousness; rule 4.421(b)(1)—he "has engaged in violent conduct that indicates a serious danger to society"; and rule 4.421(b)(5)—his prior performance on probation was unsatisfactory.

We conclude that, even if the trial court erred in relying on the aggravating circumstances in rule 4.421(a)(2) and (7), a sufficient factual basis remained for the other aggravating factors to support the imposition of

23

the middle term on count 3. Jones admitted to committing a serious violent felony within the meaning of the Three Strikes law. He also admitted the court revoked his probation, which further supports the finding his performance on probation was unsatisfactory. The record also shows Jones suffered multiple prior felony convictions, including outside California. Two California convictions involve violence against police officers and stabbing two police dogs while assisting officers in the performance of their duties.

Based on the trial court's comments at sentencing that the middle term and the Three Strikes law were sufficient punishment, and in light of the court's recognition that it had the discretion to impose the lower term but chose not to because the circumstances in aggravation outweighed those in mitigation, as the probation report also recognized, we conclude it is not reasonably probable Jones would obtain a more favorable result if we were to remand for resentencing. (See *People v. Price* (1991) 1 Cal.4th 324, 492 ["When a trial court has given both proper and [allegedly] improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper."].) We conclude the court's decision to impose the middle term on count 3 was a proper exercise of discretion. (See *Hilburn*, *supra*, 93 Cal.App.5th at p. 206.)[10]

---

[10] In light of our decision, we deem it unnecessary to decide the People's alternate contention related to forfeiture, including Jones's ineffective assistance claim.

## IV.

## Mental Health Diversion

Jones contends a conditional remand of the judgment is warranted because of recent amendments to the mental health diversion law. (§ 1001.36 et seq.) We disagree.

A. *Additional Background*

In June 2022, the trial court heard Jones's pretrial motion for mental health diversion. Jones claimed he had a qualifying mental disorder of schizoaffective, bipolar type, which played a significant role in the charged offenses; his disorder could respond to treatment, he consented to diversion, and waived his right to a speedy trial; and he did not pose an unreasonable risk of danger to public safety if treated in the community. (Former § 1001.36, subd. (b)(1)(A)–(F).) Attached to his motion were, among other documents, psychological evaluations, including one from March 9, 2022, by Dr. David DeFrancesco, interviews with family members, and school records. Dr. DeFrancesco opined that Jones met the requirements for mental health diversion, including that Jones could be treated in the community without engaging in acts of violence if Jones received treatment for his psychotic disorder.

The People opposed Jones's motion, arguing he failed to meet his burden of proof to establish (1) his mental disorder was a significant factor in the commission of the crimes, and (2) he would not pose an unreasonable risk of danger to the public if diverted. (Former § 1001.36, subd. (b)(1)(B), (F).) On the latter point, the People pointed out Jones's record of violence over the last decade.

At the outset of the June 2022 diversion hearing, the trial court stated it had read Jones's "extensive" briefs and pleadings, "including all the interviews that [his] investigator did, interviewing a lot of people, including a lot of [Jones's] relatives, and Dr. DeFrancesco's report." The court also indicated it had reviewed the brief and pleadings submitted by the District Attorney's Office.

In denying Jones's motion, the trial court agreed with the People that, as a result of Jones's extensive criminal history and his most recent crimes of violence, Jones failed to establish he would not pose an unreasonable risk of danger to public safety if treated in the community.[11] Specifically, the court found Jones used a knife in case No. 8865, a fact officers relied on to conclude Jones might be dangerous during the most recent incident; and, assuming true the allegations in the instant matter, Jones also used a knife against Hondo during another standoff with officers. The court found there was an "undue danger" that Jones was "going to slice somebody up and kill somebody" if treated in the community, as he armed himself with "box cutters" and knives.

---

[11] Although the trial court primarily relied on Jones's criminal history to deny his diversion motion, the court also doubted whether Jones had proven his "mental disorder was a significant factor in the commission of the charged offense[s]." (Former § 1001.36, subd. (b)(1)(B).) However, as Jones states in his opening brief, since his June 2022 hearing, the legislature amended the statute to create a presumption that a qualifying mental disorder is a significant factor in the commission of the charged crime, "unless there is clear and convincing evidence that [the mental disorder] was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense." (§ 1001.36, subd. (b)(2).) Because, as we discuss, substantial evidence supports the trial court's finding that, if diverted, Jones poses an unreasonable risk of danger to public safety (*id.*, subd. (c)(4)), we deem it unnecessary to address this issue.

B. *Guiding Principles*

Pretrial mental health diversion under section 1001.36 authorizes the "postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . . ." (§ 1001.36, subd. (f)(1).)  To qualify, the defendant must be both eligible and suitable for diversion.  A defendant is eligible for diversion if two criteria are met:  (1) the defendant has been diagnosed with a qualifying mental disorder, and (2) the mental disorder "was a significant factor in the commission of the charged offense." (*Id.*, subd. (b)(1), (2); *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 891 (*Sarmiento*).)  If the defendant meets the two enumerated eligibility requirements, "the court must consider whether the defendant is suitable for pretrial diversion." (§ 1001.36, subd. (c).)

" 'A defendant is suitable for pretrial diversion if all of the following criteria are met:' (1) 'In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment'; (2) 'The defendant consents to diversion and waives the defendant's right to a speedy trial'; (3) 'The defendant agrees to comply with treatment as a condition of diversion'; and (4) 'The defendant will not pose an unreasonable risk of danger to public safety, as defined in [s]ection 1170.18, if treated in the community.' " (*People v. Brown* (2024) 101 Cal.App.5th 113, 120 (*Brown*).)  "Only the fourth requirement necessitates a trial court finding— that the defendant 'will not pose an unreasonable risk of danger to public safety . . . if treated in the community.' " (*Sarmiento, supra,* 98 Cal.App.5th at p. 892, quoting § 1001.36, subd. (c)(4).)

27

As used in section 1001.36, subdivision (c)(4), " 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of [section 667, subdivision (e)(2)(C)(iv)]." (§ 1170.18, subd. (c).) Section 667, subdivision (e)(2)(C)(iv), in turn, lists categories of super strike felonies, including, as relevant here, any homicide offense. (§ 667, subd. (e)(2)(C)(iv); see *People v. Moine* (2021) 62 Cal.App.5th 440, 450 (*Moine*) ["risk of danger is narrowly confined to the likelihood the defendant will commit a limited subset of violent felonies"].)

Amendments to section 1001.36 retroactively apply to a nonfinal judgment, entitling a defendant whose hearing was held under a previous version of the statute to a remand for the trial court to exercise its "informed discretion," " 'unless the record "clearly indicate[s]" the trial court would have reached the same conclusion "even it if had been aware that it had such discretion." ' " (*People v. Doron* (2023) 95 Cal.App.5th 1, 3–4, 10, italics omitted (*Doron*).)

On appeal, we review the court's decision whether to grant a motion for mental health diversion for abuse of discretion. (*Brown, supra*, 101 Cal.App.5th at p. 121.) "The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712 (*Haraguchi*).)

## C. *Analysis*

Jones argues the trial court's finding on unreasonable risk of danger "was not so strongly supported so as to compel a finding that the amendment[] to section 1001.36 . . . could not and would not have made a difference." We disagree.

Initially, we reject Jones's contention that the trial court's dangerousness finding can be upheld on appeal only if the evidence is "so strong[]" that it "compel[s]" a finding that the amendment to section 1001.36 would not make a difference. The authorities Jones cites do not support this contention. (See, e.g., *Doron, supra,* 95 Cal.App.5th at pp. 10–11 [remand for a new prima facie evidentiary hearing based on the amendment to section 1001.36 creating a *presumption* that a defendant's qualifying mental disorder was a *substantial factor* in the commission of his or her crimes]; *Sarmiento, supra,* 98 Cal.App.5th at p. 887 [trial court *misapplied* the statutory criteria in finding the defendant posed an unreasonable risk of danger to public safety].)

Instead, we apply the substantial evidence standard to review the trial court's dangerousness finding, which requires us to examine the record in the light most favorable to the trial court's order. (*Haraguchi, supra,* 43 Cal.4th at pp. 711–712.) We must uphold the court's order "if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)

Section 1001.36, subdivision (c)(4) expressly permits the trial court to "consider the opinions of the district attorney, the defense, or a qualified mental health expert, and . . . the defendant's treatment plan, the defendant's *violence and criminal history, the current charged offense,* and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4), italics added.)

Here, substantial evidence supports the trial court's finding that, if diverted, Jones might commit homicide, a super strike. (See § 667,

subd. (e)(2)(C)(iv); *Moine*, *supra*, 62 Cal.App.5th at p. 449 [super strikes include murder and attempted murder].) As pointed out by the People, Jones had a track record of violence for about the last decade. In June 2012, Jones fractured the orbital bones of an undercover officer after the officer produced his badge and identification and told Jones he was under arrest. Jones also threw a chair at a uniformed officer that led to his conviction for aggravated assault. Jones as a result served a lengthy prison sentence.

In November 2020, Jones pulled a box cutter with the blade extended on a security guard, according to San Diego Police Department Report No. 20054572. Although no charges were filed, the report noted Jones displayed the box cutter "in a rude and angry manner" as he stepped toward the guard, who fled and called 911.

On January 25, 2021, Jones almost killed Titan, a police dog, in case No. 8865. At about 11:30 p.m., San Diego police officers responded to a call of a man causing a disturbance in the Midway District. The suspect, later identified as Jones, refused to give his name to officers, became argumentative and threw two punches at officers, then walked away while ignoring the officers' repeated requests to stop and get to the ground. After running from officers, Jones climbed on top of a shipping container while armed with a box cutter and a knife, where he remained for about three hours. During the standoff, Jones threatened officers and Titan, at one point yelling for the dog's release because the dog was "easier to kill" than humans. When Jones finally jumped off the container and stepped aggressively towards officers, Titan's handler deployed the dog. As Titan was about to tackle Jones, he turned and stabbed the dog with the knife. Officers finally subdued Jones with pepper spray. Bleeding heavily, Titan underwent

30

emergency surgery and required about 100 stitches to close the gaping wound to his abdomen.

Finally, about 11 months later while on probation, Jones again used a knife to stab another police dog, Hondo, after again threatening to use the weapon on officers and ignoring their simple commands, all while endangering the officers and the public by walking into oncoming traffic with the knife. (See *People v. Bunas* (2022) 79 Cal.App.5th 840, 862 ["there is nothing in section 1001.36, with respect to . . . suitability, that precludes a trial court from relying primarily, or even entirely, on the circumstances of the charged offense or offenses in denying a motion for diversion"].)

Considered in its totality, we conclude there is substantial evidence to support the trial court's finding that Jones "pose[d] an unreasonable risk of danger to public safety, as defined in [s]ection 1170.18, if treated in the community." (§ 1001.36, subd. (c)(4).)

Citing *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1149 (*Whitmill*), Jones contends the "Legislature intended the mental health diversion program to apply as broadly as possible." We agree. (See *People v. Frahs* (2020) 9 Cal.5th 618, 632.) But, to the extent Jones contends *Whitmill* provides meaningful guidance in the instant case, we disagree, as its facts are readily distinguishable from ours.

In *Whitmill*, the defendant sought mental health diversion of his criminal prosecution, after he fired a bullet into the air and allegedly threatened his long-time girlfriend. (*Whitmill*, *supra*, 86 Cal.App.5th at p. 1142.) After the trial court denied that request, the defendant pleaded no contest to discharge of a firearm with gross negligence, with the People agreeing to dismiss the two remaining counts. (*Id.* at p. 1147.) On appeal, the court reversed the pretrial diversion order denial, finding there was no

31

evidence, much less substantial evidence, that the defendant was likely to commit a super strike offense in the future if treated in the community. (*Id.* at p. 1150.)

In support, the *Whitmill* court noted the defendant's criminal record consisted of mere "possession and sales of drugs and theft," with no prior history of violent felony convictions (*Whitmill, supra*, 86 Cal.App.5th at pp. 1150–1151); that immediately after the incident, the defendant avoided further confrontation by "running away," "throwing away his firearm, and peacefully complying with law enforcement's request that he come forward and (presumably) be arrested" (*id.* at p. 1151); and that the defendant's conduct was a "fry cry from indicating that [he was] likely to commit a super-strike offense in the future" (*ibid.*).

In contrast to the facts in *Whitmill*, the record here contains substantial evidence to support the trial court's finding that Jones was likely to commit a super strike offense—murder or attempted murder—if treated in the community. (See *Moine, supra*, 62 Cal.App.5th at p. 449.) As summarized *ante*, Jones's criminal record shows a history of violence against police.

Moreover, unlike the defendant in *Whitmill* who sought to deescalate the confrontation with police by immediately following the officers' directions and peacefully giving himself up (*Whitmill, supra*, 86 Cal.App.5th at p. 1153), here Jones repeatedly refused to follow simple commands by officers to drop his weapon(s) and get to the ground, instead confronting the officers and threatening to kill them, leading to the stabbing of a police dog while on probation for similar conduct that occurred about 11 months earlier. We thus conclude *Whitmill* is inapposite in the instant case.

Finally, Jones also contends a conditional remand of the judgment is necessary for a new mental health diversion hearing due to an amendment to the mental health diversion laws following the trial court's denial of his pretrial motion in June 2022. We disagree.

The statutory changes to section 1001.36 referred to by Jones went into effect on January 1, 2023. (Stats. 2022, ch. 735, § 1.) The amendments " 'simplify the procedural process for obtaining diversion by presuming that a defendant's diagnosed "mental disorder" has a connection to their offense' and permit the court to deny diversion if the People rebutted the presumption" (*Doron*, *supra*, 95 Cal.App.5th at p. 8); and express a general legislative intent favoring alternatives to incarceration including, among others, "diversion" (§ 17.2, subd. (b)). Neither of these changes, however, affect the public safety exception to diversion which the trial court here found applicable. (§ 1001.36, subd. (c)(4).)

In sum, because substantial evidence supports the trial court's finding that Jones poses an unreasonable risk of danger to public safety if treated in the community, we deny his request for a conditional remand of the judgment for a new hearing under the amended diversion law.[12]

---

[12] In light of our decision, we deem it unnecessary to decide the People's alternate contention that Jones forfeited his right to a new evidentiary hearing by failing to renew his request for diversion, including Jones's ineffective assistance claim.

## DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:

DATO, Acting P. J.

KELETY, J.